## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JUSTINE O. MOCHAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 14-2121-KHV** |
| TIMOTHY ZWETOW, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

Plaintiff Justine Osoro Mochama, an immigration detainee, brings suit against Timothy Zwetow, Rodney Nichols, Alan Van Skike, Jane Patty-Kill and Andrew Pleviak, who are employees of the United States Immigration and Customs Enforcement ("ICE").[1]  Plaintiff asserts five claims under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971): (1) against all defendants, excessive force in violation of the Fourth and Fifth Amendments (Count I); (2) against Nichols, Van Skike, Patty-Kill and Pleviak, failure to intervene and prevent excessive force in violation of the Fourth and Fifth Amendments (Count II); (3) against Zwetow and Nichols , unlawful solitary confinement in violation of the Fifth Amendment (Count III); (4) against all defendants, retaliation in violation of the First Amendment (Count IV); and (5) against all defendants, violation of plaintiff's right to counsel under the Fifth Amendment (Count V).  This matter is before the Court on the Federal Defendants' Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment (Doc. #74) filed July 29, 2015.  For reasons set forth below, the Court finds that defendants' motion should be sustained in part.

---

[1]      On March 7, 2016, the Court sustained plaintiff's motion to dismiss his claims against Advanced Correctional Healthcare under Rule 41(a)(2), Fed. R. Civ. P.  See Doc. #92.

I.      **Motion To Dismiss**

A.      Legal Standards

Courts apply different standards to a motion to dismiss based on lack of subject matter jurisdiction under Rule 12(b)(1), Fed. R. Civ. P., and a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P. Muscogee (Creek) Nation v. Pruitt, 669 F.3d 1159, 1167 (10th Cir. 2012). When faced with a motion to dismiss which relies on both aspects of Rule 12, a court must determine whether it has subject matter jurisdiction under Rule 12(b)(1) before addressing the merits of the claims under a Rule 12(b)(6) analysis. State v. Nat'l Indian Gaming Comm'n, 151 F. Supp. 3d 1199, 1208 (D. Kan. 2015) (citing Bell v. Hood, 327 U.S. 678, 682 (1946)).

1.      Rule 12(b)(1)

Defendants seek to dismiss plaintiff's claims in Counts III, IV and V for lack of subject matter jurisdiction. Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take the form of facial attacks on the complaint or factual attacks on the accuracy of its allegations. City of Albuquerque v. U.S. Dep't of Interior, 379 F.3d 901, 906 (10th Cir. 2004) (quoting Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002)). Here, defendants challenge the face of the complaint, so the Court presumes the accuracy of plaintiff's factual allegations and does not consider evidence outside the complaint. See Ruiz, 299 F.3d at 1180.

Courts may exercise jurisdiction only when specifically authorized to do so, see Castaneda v. INS, 23 F.3d 1576, 1580 (10th Cir. 1994), and must "dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." Scheideman v. Shawnee Cty. Bd. of Cty. Comm'rs, 895 F.Supp. 279, 280 (D. Kan. 1995) (citing Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)); Fed. R. Civ. P. 12(h)(3)). Because federal courts are

courts of limited jurisdiction, the law imposes a presumption against jurisdiction.  Marcus v. Kan. Dep't of Revenue, 170 F.3d 1305, 1309 (10th Cir. 1999).  Plaintiff bears the burden of showing that jurisdiction is proper, see id., and must demonstrate that the case should not be dismissed, see Jensen v. Johnson County Youth Baseball League, 838 F.Supp. 1437, 1439-40 (D. Kan. 1993).

> 2.    Rule 12(b)(6)

Defendants also seek to dismiss plaintiff's complaint under Rule 12(b)(6), Fed. R. Civ. P., claiming that it fails to state a claim upon which the Court can grant relief.  In ruling on a motion to dismiss under Rule 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible – and not merely conceivable – on its face.  Id. at 679-80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions.  See id.; Hall v. Bellmon, 935 F.3d 1106, 1110 (10th Cir. 1991).  Plaintiff bears the burden of framing his complaint with enough factual matter to suggest that he is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements.  Twombly, 550 U.S. at 556.  Plaintiff makes a facially plausible claim when he pleads factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged.  Iqbal, 556 U.S. at 678.  Plaintiff must show more than a sheer possibility that defendants have acted unlawfully – it is not enough to plead facts that are "merely consistent with" defendants' liability.

Id. (quoting Twombly, 550 U.S. at 557).  A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not stand.  Iqbal, 556 U.S. at 678.  Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not "shown" – that the pleader is entitled to relief.  Id.  The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case.  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008) (quoting Phillips v. Cty. of Allegheny, 515 F.3d 224, 232-33 (3d Cir. 2008)).

B.     Factual Background - Motion To Dismiss

As noted, in ruling on a motion to dismiss, the Court assumes as true all well-pleaded facts in the complaint.  Here, the complaint alleges the following facts.

Justine Osoro Mochama is a native of Kenya who came to the United States as a student. Third Amended Complaint (Doc. #67) filed June 1, 2015 at 2.  In March of 2013, agents for the Department of Homeland Security ("DHS") arrested Mochama pursuant to an order of removal which directed that he be deported to Kenya because his student visa had expired.

From March of 2013 through January of 2014, DHS detained Mochama at the Butler County Adult Detention Facility to await deportation.  After his arrest, Mochama cooperated by signing and fingerprinting certain documents.  Id. at 3.

On January 17, 2014, Mochama filed a pro se petition for a writ of habeas corpus.  See Mochama v. DHS, Case No. 14-cv-3015-RDR (D. Kan. 2014).  Mochama alleged that his detention had exceeded the presumptively reasonable six-month period set out in Zadvydas v. Davis, 533 U.S.

678, 701 (2001).

Early in the morning of January 28, 2014, Mochama was asleep in his cell when ICE agents Rodney Nichols and Timothy Zwetow woke him. The agents told him that he needed to sign and fingerprint a Form I-229a.[2] The agents did not tell him that he was scheduled to be deported. "Concerned that he was being tricked into signing papers that would jeopardize his habeas petition," Mochama told the agents that he would need to speak with an attorney before signing or putting his fingerprint on any more documents. Complaint (Doc. #67) at 4. Nichols and Zwetow refused to let Mochama contact an attorney and insisted that he sign and fingerprint the form.[3] Id. Nichols and Zwetow then physically assaulted Mochama to try to force him to fingerprint the Form I- 229a.

Specifically, at around 4:15 AM, Mochama was standing with his hands in his pockets next to the booking desk at the Butler County Detention Facility. Nichols and Zwetow approached Mochama from each side and lifted him into the air in an apparent attempt to get his hands free, so that they could force him to fingerprint the Form I-229a. Id. at 5. Mochama insisted that he would not fingerprint the form until his attorney could see it. Nichols pulled hard on Mochama's right arm, causing him to fall forward. Zwetow punched Mochama in the stomach with his closed right fist. He then put his right arm around Mochama's neck from behind and squeezed, choking Mochama and pulling him backward. Zwetow then crouched with his right knee on the floor and slammed Mochama head first into the concrete floor. Id.

---

[2]     INS Form I-229a is a Warning for Failure to Depart.

[3]     DHS guidelines provide for service of a Form I-229a within 30 days of detention. Form I-229a informs an immigrant of the consequences of failing to cooperate with removal, and it contains a box for the immigrant's fingerprint to confirm that has he received the form. The Deportation Officers' Field Manual states that Form I-229a does not have to be personally served with proof of service by the immigrant's fingerprint; it can also be served by certified mail.

After his head hit the floor, Mochama put his left arm under his head to protect it. Zwetow got on top of Mochama and forced his head into the concrete floor while Nichols tried to get Mochama's right hand from his pocket. Zwetow then left to get the Form I-229a and inkpad. When he returned, Nichols was laying with his full weight on Mochama and reaching underneath Mochama to try to pull his arms out. Id. Zwetow placed his right hand on Mochama's head and pushed it to the concrete while he pulled at Mochama's hands. Nichols and Zwetow then picked Mochama up and put him in a chair where Mochama allowed them to place him in handcuffs. Mochama then walked into a holding cell. While he was there, an employee cleaned Mochama's blood from an area of the floor approximately two feet square.

During this incident, Nichols and Zwetow used far more force than necessary or reasonable and caused substantial pain and physical harm to Mochama.[4] Id. at 6. Neither agent attempted to intervene when the other was harming Mochama. Nichols and Zwetow engaged in prohibited, dangerous tactics which their own agency outlawed, that risked serious injury or death to Mochama. Two surveillance cameras at the Butler County Detention Facility captured the incident.

After the incident, Nichols and Zwetow transferred Mochama to the ICE office in Wichita, Kansas. Id. There, defendants refused Mochama's request to speak with his attorney. Zwetow and ICE agent Jane Patty-Kill attempted to force Mochama's hands from his pockets to fingerprint the Form I-229a. Zwetow picked up Mochama from behind and lifted him into the air, causing him great pain in his midsection, stomach, hand and rib cage. Mochama could not breathe and was afraid for his life. Zwetow kneed the back of Mochama's legs with his right leg, causing Mochama

---

[4]     The complaint alleges that Nichols and Zwetow took these actions with wanton and gross disregard for Mochama's well-being and used force was which "far in excessive of any degree of force that could have hypothetically been reasonable." Complaint (Doc. #67) at 6.

to bend forward. Zwetow then put his right arm around Mochama's neck and swung him to the right, causing Mochama's head to hit a pillar or wall. Id. at 7.

Zwetow and Patty-Kill pushed Mochama to the concrete floor. Nichols and ICE agents Alan Van Skike and Andrew Pleviak also participated. None of the five agents intervened or attempted to intervene when others were harming Mochama. Once Mochama was on the floor, Zwetow laid on top of him and Nichols and Van Skike pushed Mochama's face and body to the floor. Meanwhile, Patty-Kill and Pleviak forced Mochama's hand onto an inkpad and then onto the Form I-229a. Id. at 7-8. Cameras in the ICE office recorded this incident.

Mochama told defendants that he had suffered a head injury and needed to go to a hospital. The agents placed Mochama into a holding cell, where he vomited and experienced symptoms of a head injury.[5]

That same day, Nichols and Zwetow drove Mochama back to the Butler County Detention Facility and ordered that he be placed in segregation for refusing to fingerprint the form. Nichols and Zwetow falsely reported that Mochama had "kicked" an ICE officer. Id. at 9. The officers did not comply with ICE Policy 11065.1, which outlines very specific conditions under which an ICE detainee may be placed in segregation. The officers did not allow Mochama to call his attorney. Id.

When Mochama arrived back at the Butler County Detention Facility on January 28, 2014, he requested medical assistance. He told nurse Larimer[6] that ICE officers had beaten him about the head and body and that he had pain in his head, right hand and left elbow. Larimer observed that

---

[5]     While he was in the ICE holding cell, Mochama witnessed the five named defendants attack a second Kenyan national in the same manner. Complaint (Doc. #67) at 8.

[6]     The complaint does not include Larimer's first name. See Doc. #67 at 9.

Mochama had dried blood on his face and a cut on his ear.  She gave him Tylenol and escorted him back to his cell.

On January 31, 2014, ICE officer Karl Timmons told Mochama that he had viewed the video of the incident in the ICE office in Wichita on January 28, 2014.  Timmons told Mochama that in his opinion, it did not look like Mochama had kicked anyone.  Id. at 9.[7]

On February 6, 2014, Mochama sought medical treatment at the Butler County Detention Facility for continuing severe headaches and nightmares, which he attributed to the head injuries that he suffered on January 28, 2014.  Despite his complaints, the facility did not screen him for a concussion or internal injuries.  Id. at 10.

On February 14, 2014, Zwetow went to the Butler County Detention Facility and asked Mochama to sign a Form I-229a and other papers.  Mochama told Zwetow that he would sign the papers if he could first speak with his attorney.  Id.  Zwetow responded he would just write "refused to sign" on the paperwork.  Mochama repeated that he was not refusing to sign but only wanted to speak with his attorney before signing it.  Mochama was not permitted to speak with his attorney until after Zwetow had left on February 14, 2014.

On February 14, 2014, Zwetow wrote on a Form I-229a that Mochama "refused to sign" it.  Defendants did not serve the Form I-229a on Mochama's attorney before plaintiff filed the complaint in this case.  Id.

Since defendants attacked and beat him on January 28, 2014, Mochama has had continued

---

[7]     On February 3, 2014, Mochama's counsel wrote to Kenneth Carlson, Director of the ICE Field Office in Kansas City, which has administrative jurisdiction over the ICE office in Wichita, to inform him about the incidents on January 28, 2014.  Complaint (Doc. #67) at 9.  On March 18, 2014, Mochama's counsel sent the same message to Todd Nay, Assistant Field Office Director.  On February 3, 2014, Mochama's counsel made a formal complaint and request for investigation to the DHS Office of Inspector General.  None of the three responded.  Id. at 9-10.

pain in his head and elbow and experienced depression, extreme anxiety and emotional trauma, including inability to sleep, nightmares about officers attacking him and fear of further attacks.  Id. at 12.

C.      Analysis – Motion To Dismiss

Defendants seek to dismiss Counts III, IV and V for lack of subject matter jurisdiction under Rule 12(b)(1).   Specifically, defendants assert that two provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. Sections 1252(b)(9) and 1252(g), deprive the Court of subject matter jurisdiction over plaintiff's claims for unlawful solitary confinement in violation of the Fifth Amendment (Count III), retaliation in violation of the First Amendment (Count IV) and violation of the right to counsel under the Fifth Amendment (Count V).  In the alternative, defendants assert that Counts III, IV and V fail to state a claim under Rule 12(b)(6).  As noted, when faced with a motion to dismiss under both Rule 12(b)(1) and 12(b)(6), the Court must first determine whether it has subject matter jurisdiction under Rule 12(b)(1).  See State v. Nat'l Indian Gaming Comm'n, 151 F. Supp. 3d 1199, 1208 (D. Kan. 2015).

1.      Subject Matter Jurisdiction

As noted, defendants assert that INA Sections 1252(b)(9) and 1252(g) deprive the Court of subject matter jurisdiction over Counts III, IV and V.[8]

---

[8]      In arguing that the Court lacks subject matter jurisdiction, defendants focus almost entirely on Section 1252(g); they cite Section 1252(b)(9) but do not address it in any detail.  Federal district courts have an independent duty to examine whether they have subject matter jurisdiction. Harris v. Tulsa 66ers, 551 F. App'x 451, 451 (10th Cir. 2014); Fed. R. Civ. P. 12(h)(3) (court must dismiss at any time if it determines that it lacks subject matter jurisdiction).

a.      Section 1252(b)(9)

Defendants assert that Section 1252(b)(9) deprives the Court of subject matter jurisdiction over Counts III, IV and V.  Section 1252(b)(9) provides in part as follows:

> With respect to review of an order of removal . . . [j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section.  Except as otherwise provided in this section, no court shall have jurisdiction . . . to review such an order or such questions of law and fact.

8 U.S.C. 1252(b)(9).  Other provisions in Section 1252 provide that an alien seeking judicial review of a final order of removal must file a petition for review in the appropriate court of appeals.  See 8 U.S.C. § 1252(a)(2)(D) and (a)(5).  The Supreme Court has described Section 1252(b)(9) as a "zipper clause" which consolidates judicial review of immigration proceedings into one action in the court of appeals.  See INS v. St. Cyr, 533 U.S. 289, 313 (2001) (quoting Reno v. American-Arab Anti-Discrimination Comm. ("AADC"), 525 U.S. 471, 483 (1999).

Plaintiff responds that Section 1252(b)(9) only applies to questions whether an immigrant is legally removable and does not extend to unrelated claims that defendants violated his constitutional rights.  See Argueta v. U.S. Immigration & Customs Enf't, No. 08-1652, 2009 WL 1307236, at *14 (D.N.J. May 7, 2009).

Courts are split on how far the INA's jurisdiction-stripping provisions extend.  See Diaz-Bernal v. Myers, 758 F. Supp.2d 106, 124-126 (D. Conn. 2010); Escobar v. Gaines, No. 3-11-0994, 2014 WL 4384389, at *4 (M.D. Tenn. Sept. 4, 2014).  Compare Argueta, No. 08-1652, 2009 WL 1307236, at *14 (Section 1252(b)(9) did not preclude district court review of Bivens claim for unlawful search and arrest in violation of Fourth Amendment) with Arias v. U.S. Immigration & Customs Enf't, No. 07-1959, 2008 WL 1827604, at *6 (D. Minn. Apr. 23, 2008) (no jurisdiction to

-10-

consider Fourth, Fifth and Sixth Amendment <u>Bivens</u> claims arising from enforcement operation because such claims are common in removal proceedings, could directly impact plaintiff's immigration status and directly arise from action taken to remove alien).

The Third Circuit has held that because Section 1252(b)(9) is subject to the limitations of Section 1252(b), it only limits review of an order of removal.  <u>Chehazeh v. Att'y Gen.</u>, 666 F.3d 118, 131 (3rd Cir. 2012) (citing <u>St. Cyr</u>, 533 U.S. at 313).  "Section 1252(b)(9) . . . requires only that, when there is an order of removal under subsection (a)(1), review of any issues related to that order must be consolidated into a single petition for review and cannot be brought piecemeal."  <u>Id.</u> The Sixth Circuit has stated that "[w]e  . . . cannot endorse an interpretation of the 'arising from' language in [Section] 1252(b)(9) that 'swallow[s] all claims that might somehow touch upon, or be traced to, the government's efforts to remove an alien."  <u>Hamdi v. Napolitano</u>, 620 F.3d 615, 626 (6th Cir. 2010) (Section 1252(b)(9) only reaches claims for judicial review arising from action taken or proceeding brought to remove alien).  The Ninth and Eleventh Circuits have also held that when a person is not seeking review of an order of removal under subsection (a)(1), the limitations of Section 1252(b)(9) do not apply.  <u>See</u> <u>Singh v. Gonzales</u>, 499 F.3d 969, 978 (9th Cir. 2007); <u>Madu v. Att'y Gen.</u>, 470 F.3d 1362, 1367 (11th Cir. 2006).

In <u>Aguilar v. United States Immigration & Customs Enforcement,</u> the First Circuit held that "the reach of section 1252(b)(9) is not limited to challenges to singular orders of removal."  510 F.3d 1, 9 (1st Cir. 2007) (claim that government infringed aliens' right to counsel arose from removal, and was  thus subject to statute requiring exhaustion and limiting judicial review in removal proceedings; in contrast, substantive due process claim that government violated aliens' right to make decisions as to care, custody and control of their children did not arise from removal).

The Tenth Circuit has not weighed in on this issue.  Following the majority of circuits, and

based on Supreme Court instruction in <u>St. Cyr</u>, however, it appears that the Tenth Circuit would hold that Section 1252(b)(9) applies only "[w]ith respect to review of an order of removal under subsection (a)(1)." 8 U.S.C. § 1252(b). Here, except as to plaintiff's claims regarding the right to counsel (Count V), plaintiff does not seek review of the order of removal. The Court therefore finds that Section 1252(b)(9) does not preclude judicial review of plaintiff's claims in Count III (unlawful solitary confinement) and Count IV (retaliation).

Count V asserts that defendants violated plaintiff's right to counsel under the Fifth Amendment. Aliens have no constitutional right to counsel in removal proceedings. <u>See</u> <u>Lozada v. INS</u>, 857 F.2d 10, 13 (1st Cir. 1988); <u>see also</u> <u>INS v. Lopez-Mendoza</u>, 468 U.S. 1032, 1038 (1984) (deportation proceeding is purely civil action to determine eligibility to remain; protections that apply in criminal context do not apply in deportation proceeding). Aliens are entitled to due process, however, see <u>Lozada</u>, 857 F.2d at 13, and the INA provides that in removal proceedings, an alien "shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose." 8 U.S.C. § 1362.

Plaintiff asserts that defendants infringed his right to counsel by not responding when he asked to speak to a lawyer when they told him that he needed to fingerprint the Form I-229a. The threshold question is whether this claim arises from an order of removal or whether it is independent of, or collateral to, the removal process – and thus not subject to the channeling effect of Section 1252(b)(9).

In <u>Aguilar</u>, the First Circuit found that "[b]y any realistic measure, the alien's right to counsel is part and parcel of the removal proceeding itself." 510 F.3d at 13 (citing 8 U.S.C. § 1362). It reasoned that an alien's right to counsel "possesses a direct link to, and is inextricably intertwined

with, the administrative process that Congress so painstakingly fashioned." Id.  The First Circuit also stated that the frequency with which right-to-counsel claims arise in removal proceedings refutes any notion that such claims are sufficiently separate from removal proceedings to be considered either "independent" or "collateral."  Id. (citing Michel v. INS, 206 F.3d 253, 258 (2d Cir. 2000)); see Batanic v. INS, 12 F.3d 662, 667 (7th Cir. 1993); Rios-Berrios v. INS, 776 F.2d 859, 862-64 (9th Cir. 1985).  The First Circuit reasoned that allowing aliens to ignore the channeling provisions of Section 1252(b)(9) and to bring right-to-counsel claims directly in district court would result in precisely the type of fragmented litigation that Congress sought to forbid.  Id.  This Court agrees and finds that it lacks jurisdiction under Section 1252(b)(9) to entertain plaintiff's claim in Count V.[9]

b.    U.S.C. § 1252(g)

Defendants also assert that Section 1252(g) deprives the Court of subject matter jurisdiction over Counts III and IV.  Section 1252(g), titled "Exclusive Jurisdiction," states as follows:

> Except as provided in this section and notwithstanding any other provision of law, . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).  Defendants argue that Counts III and IV arise from the decision or action by the Attorney General to "execute" a removal order, and Section 1252(g) therefore precludes review of plaintiff's claims.

---

[9]    As noted, this Court does not adopt the First Circuit's narrow view of jurisdiction under Section 1252(b)(9).  However, the First Circuit's reasoning on the right to counsel appears sound under a broader view as well.

In AADC, the Supreme Court narrowly construed Section 1252(g), stating that it does not bar judicial review of all claims arising from deportation proceedings.  525 U.S. at 482 (Section 1252(g) does not bar judicial review of many decisions made during deportation process, including decisions to open investigation, surveil suspected violator and reschedule deportation hearing).  The Supreme Court ruled that by its express language, Section 1252(g) applies only to three discrete decisions or actions: the "decision or action" to (1) commence proceedings, (2) adjudicate cases or (3) execute removal orders.[10]  Id.

In AADC, the Supreme Court discussed the legislative history of recent amendments to the INA, stating that Congress amended the INA to protect the Attorney General from lawsuits for declining to exercise  discretion in dealing with removal of undocumented aliens.  525 U.S. at 482; see Argueta, 2009 WL 1307236, at *15.  Despite its potential broad reach, Section 1252(g) "is to be read narrowly and precisely" to prevent review only of the three narrow discretionary decisions or actions referred to in the statute."  Garcia v. Att'y Gen., 553 F.3d 724, 729 (3d Cir. 2009) (quoting Sabhari v. Reno, 197 F.3d 938, 942 (8th Cir. 1999)).

Defendants correctly point out that the Tenth Circuit has ruled that Section 1252(g) applies

---

[10]     The three discrete actions which fall under the jurisdictional bar of Section 1252(g) represent distinct components of the deportation process.  The first action, "commencing proceedings," occurs when law enforcement officers apprehend an alien with no legal status in the United States and file a charging document with the immigration court.  DeLeon-Holguin v. Ashcroft, 253 F.3d 811, 815 (5th Cir. 2001); see Maria S v. Garza, No. 1:13-CV-108, 2015 WL 4394745, at *3 (S.D. Tex. July 15, 2015) (charging document served on alien gives notice of nature of proceedings and time to prepare defense).

"Adjudicating cases" refers to removal proceedings which lead to a hearing before an immigration judge who decides the "inadmissibility or deportability of an alien."  8 U.S.C. § 1229a. If the immigration judge finds that an alien has no legal status to remain in the United States, the immigration judge issues an order of removal.  Id.

The third action, "executing removal orders," occurs when officials remove an illegal alien from the United States pursuant to a court order.  See Sifuentes-Barraza v. Chertoff, No. 03-51202, 2006 WL 2522143, at *1 (5th Cir. Sept. 1, 2006).

to review of discretionary and non-discretionary decisions.  Tsering v. U.S. Immigration & Customs Enf't, 403 Fed. App'x 339, 343 (10th Cir. 2010) (citing Foster v. Townsley, 243 F.3d 210, 214 (5th Cir. 2001)) (AADC did not explicitly state that Section 1252(g) applies only to review of discretionary decisions; plain statutory language speaks of "any cause or claim" that arises from decision or action by Attorney General to commence proceedings, adjudicate cases or execute removal orders).  The Tenth Circuit reviews whether claims are "connected directly and immediately with a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders.'"  Tsering, 403 Fed. App'x at 343 (quoting Humphries v. Various INS Emps., 164 F.3d 936, 943) (5th Cir. 1999) (substantive and procedural due process claims that ICE exceeded authority in removing plaintiff based on wrongfully obtained travel documents were "connected directly and immediately with execution of removal order" and thus Section 1252 barred judicial review)).  Defendants assert that Counts III and IV arise from the Attorney General's decision or action to "execute removal orders," which occurs when officials remove an illegal alien from the United States pursuant to a court order.[11]  See Sifuentes-Barraza v. Chertoff, No. 03-51202, 2006 WL 2522143, at *1 (5th Cir. Sept. 1, 2006). Defendants assert that the Court therefore lacks subject matter jurisdiction over Counts III and IV.[12]

---

[11]     Defendants do not assert that the INA bars Counts I and II.  In other words, they concede that Section 1252(g) does not apply to Bivens claims of physical mistreatment of aliens who are in custody, because such conduct bears no more than a remote relationship to the Attorney General's decision to execute a removal order.  Humphries, 164 F.3d at 943-45.

[12]     The parties do not separately analyze how Section 1252(g) affects Counts III and Count IV but the Court finds it imperative to do so.

i.      Count III (Fifth Amendment – Solitary Confinement)

Defendants contend that Section 1252(g) deprives the Court of subject matter jurisdiction over Count III.  In Count III, plaintiff alleges that Nichols and Zwetow violated his Fifth Amendment rights to due process when they placed him in solitary confinement without notice or opportunity to be heard.[13] Defendants assert that Section 1252(g) bars plaintiff's Fifth Amendment due process claim because it is connected directly to the Attorney General's decision or action to execute a removal order.

Clearly, defendants argue, they would not have placed plaintiff in solitary confinement if the Attorney General had not decided to execute the removal order.  But the Court finds that this connection is not sufficient to bring Count III within the jurisdictional bar of Section 1252(g).  See Humphries, 164 F.3d at 945 (though plaintiff would not have been subjected to alleged mistreatment absent decision to place him in detention while awaiting exclusion, connection to decision not sufficient to bring suit within purview of Section 1252(g)).  Plaintiff does not ask the Court to review whether the decision to execute the removal order was appropriate, but whether placing him in solitary confinement violated his Fifth Amendment due process rights.  See Maria S. v. Garza, No. 1:13-CV-108, 2015 WL 4394745, at *3-4 (S.D. Tex. July 15, 2015) (Section 1252(g) did not bar plaintiff's challenge to constitutionality of procedures used to secure consent to voluntary departure after removal process initiated). The Court therefore finds that it has subject matter jurisdiction over Count III (plaintiff's Fifth Amendment due process claim).

---

[13]      Specifically, Count III alleges that Nichols and Zwetow caused plaintiff to be placed in solitary confinement based on a false accusation that plaintiff had kicked an ICE officer.  See Third Amendment Complaint (Doc. #67) at 16.

ii.     Count IV (First Amendment Retaliation)

Defendants contend that Section 1252(g) deprives the Court of subject matter jurisdiction over Count IV.  Count IV alleges that defendants violated plaintiff's First Amendment rights when they retaliated against him for constitutionally protected speech: his refusal to sign documents, demand to speak with an attorney, request for medical treatment and complaint that ICE agents had attacked him.  Specifically, plaintiff asserts that defendants caused him to be placed in solitary confinement and physically forced him to fingerprint ICE documents in retaliation for protected speech.  See Complaint (Doc. # 67) at 17-18.  Defendants assert that Section 1252(g) bars this claim because it is arises from the Attorney General's decision or action to execute the removal order.

The Court has found no cases which directly address similar facts.  In Foster v. Townsley, 243 F.3d 210, 214 (5th Cir. 2001), the Fifth Circuit found that it lacked jurisdiction under Section 1252(g) to review plaintiff's claims of excessive force, due process, equal protection and retaliation when ICE officers deported plaintiff despite a stay of deportation.  The Fifth Circuit found that plaintiff's claims arose from the decision to execute a removal order, and that it therefore lacked jurisdiction.  Townsley, 243 F.3d at 214.  In Townsley, however, plaintiff sought to challenge the order of removal.  By contrast, Mochama does not challenge the removal order.  The Court therefore finds that it has subject matter jurisdiction over Count IV (plaintiff's First Amendment retaliation claim).

-17-

2.      Failure To State A Claim

Defendants assert that Counts III and IV fail to state a claim under Rule 12(b)(6), Fed. R. Civ. P.[14]  As noted, in ruling on a motion to dismiss under Rule 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has not shown that the pleader is entitled to relief.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

a.      Count III (Fifth Amendment Due Process – Solitary Confinement)

Count III asserts that Nichols and Zwetow violated plaintiff's Fifth Amendment due process rights when they falsely reported that he had kicked an ICE officer and caused jail officials to place him in solitary confinement (for an unspecified length of time) based on that false report.  Plaintiff seeks a remedy under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  Nichols and Zwetow assert that the Court must dismiss Count III because it fails to state a claim for relief under Rule 12(b)(6).  Specifically, defendants assert that (1) aliens who are detained pending deportation do not have a Bivens claim that solitary confinement has violated the Fifth Amendment due process clause and (2) plaintiff has failed to allege facts which set out such a claim.

Defendants first assert that the Court should not extend Bivens to plaintiff's solitary confinement claim under the Fifth Amendment guarantee of due process.  In Bivens, the Supreme Court first recognized an implied private action for damages against federal officers who allegedly

---

[14]      Defendants also assert that Count V fails to state a claim under Rule 12(b)(6).  The Court lacks jurisdiction over Count V, however, and therefore does not address defendants' argument that Count V fails to state a claim.

violated a citizen's Fourth Amendment rights while acting in their official capacities. 403 U.S. at 396 (plaintiff entitled to money damages for injuries suffered when FBI agents violated Fourth Amendment rights). The Supreme Court has extended <u>Bivens</u> to claims for damages when federal officials engage in certain conduct that violates the Fifth and Eighth Amendments because a complete absence of alternative remedies required recognizing an implied cause of action. <u>See</u> <u>Walden v. Ctrs. for Disease Control & Prevention</u>, 669 F.3d 1277, 1284 n.3 (11th Cir. 2012) (citing <u>Carlson v. Green</u>, 446 U.S. 14 (1980); <u>Davis v. Passman</u>, 442 U.S. 228 (1979)).

The Supreme Court has not extended <u>Bivens</u> to a new context since 1980. <u>See</u> <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 70 (2001) ("we have extended [Bivens] only twice, to provide an otherwise nonexistent cause of action against *individual officers* alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer's unconstitutional conduct."); <u>see also</u> <u>De La Paz v. Coy</u>, 786 F.3d 367, 372 (5th Cir. 2015) (Supreme Court has not created <u>Bivens</u> remedy in 35 years and has reversed many appellate decisions that created new actions for damages).

Defendants contend that plaintiff cannot assert a <u>Bivens</u> claim for solitary confinement without due process because INA regulations provide for review of plaintiff's detention, and therefore he has an alterative means by which to challenge continued detention. <u>See</u> <u>Defendants' Opening Brief</u> (Doc. #75) at 19-20 (citing <u>Malesko</u>, 534 U.S. 61, 69 (2001)). Because defendants are entitled to dismissal of Count III for failure to state a claim on other grounds, however, the Court need not decide whether a <u>Bivens</u> remedy is available.

Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims.

Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998).  To evaluate the constitutionality of prison conditions which implicate a pretrial detainee's liberty interests, the Court determines whether defendants imposed a particular condition to punish.  Bell v. Wolfish, 441 U.S. 520, 535 (1979) (under Due Process Clause, detainee may not be punished prior to adjudication of guilt in accordance with due process of law).  If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Id. at 539 (not every disability imposed during pretrial detention amounts to "punishment" in constitutional sense).  Unless prison officials show an expressed intent to punish, whether the restriction amounts to punishment generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Id. at 538.  If a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court may infer that the purpose of the governmental action is punishment.  Id. at 539.  However, "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." Id. at 540.

To establish an Eighth Amendment conditions-of-confinement claim,  plaintiff must satisfy two requirements, consisting of an objective and a subjective component.  Lewis v. McKinley Cty. Bd. of Comm'rs, 425 Fed. Appx. 723, 726-27 (10th Cir. 2011) (citing McBride v. Deer, 240 F.3d 1287, 1291 (10th Cir. 2001)).  To satisfy the objective component, plaintiff must allege facts to demonstrate that the deprivation was "sufficiently serious." Id. at 727 (quoting Fogle v. Pierson, 435 F.3d 1252, 1260 (10th Cir. 2006)).  The subjective component requires plaintiff to show that

defendants knew of and disregarded an excessive risk to his health or safety.  Murray v. Edwards Cty. Sheriff's Dep't, 248 Fed. App'x 993, 997 (10th Cir. 2007).

Plaintiff alleges that on January 28, 2014, defendants wrongfully caused him to be placed in solitary confinement (for an unspecified period of time), which caused him "physical and emotional pain and suffering, humiliation, loss of enjoyment, and severe emotional distress."  Defendants assert that this claim is conclusory and unsupported by specific facts.  Defendants correctly point out that solitary confinement is not per se unconstitutional, Hutto v. Finney, 437 U.S. 678, 686 (1978), and that plaintiff's third amended complaint does not include any facts about the duration or conditions of the confinement.  Further, plaintiff does not point to any record evidence regarding how long he remained in solitary confinement.  Plaintiff does not allege any specific or serious deprivation of food, clothing, shelter or medical care, or specify the length of his alleged placement in solitary confinement.  See Ledbetter v. City of Topeka, Kan., 318 F.3d 1183, 1188 (10th Cir. 2003) (pretrial detainee must be afforded humane conditions of confinement by ensuring basic necessities of adequate food, clothing, shelter, and medical care and reasonable measures to guarantee safety).  Thus, plaintiff fails to satisfy the objective component of a due process claim.

Plaintiff has not alleged a serious deprivation of basic necessities.  Thus, he cannot satisfy the subjective component, e.g., that  Nichols and Zwetow and knew of or disregarded a risk to his health or safety.  Count III fails to state a claim upon which relief can be granted.  The Court therefore dismisses this claim.

b.    Count IV (First Amendment Retaliation)

Defendants assert that the Court must dismiss Count IV because it fails to state a claim for relief under Rule 12(b)(6).  Count IV alleges that defendants violated plaintiff's First

Amendment rights when they placed him in solitary confinement (for an unspecified period) to retaliate against him for constitutionally protected speech.  Specifically, plaintiff asserts that defendants caused him to be placed in solitary confinement when he refused to sign documents, demanded to speak with an attorney, asked for medical treatment and complained that ICE agents had attacked him.  Plaintiff seeks a remedy under Bivens, 403 U.S. 388 (1971).  Defendants assert that the Court must dismiss plaintiff's First Amendment retaliation claim because Courts have not extended Bivens remedies to First Amendment claims.

As noted, the Supreme Court has not extended Bivens since 1980.  See Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70 (2001).  Further, the Supreme Court has specifically refused to recognize a Bivens claim by federal prisoners for monetary damages based upon an alleged First Amendment violation.  See, e.g., Ashcroft v. Iqbal,  556 U.S. 662, 675 (2009) (Court has declined to extend Bivens to claim sounding in First Amendment); see also Bush v. Lucas, 462 U.S. 367, 390 (1983) (declining to recognize right to seek damages for alleged First Amendment violation pursuant to Bivens; declining to create new substantive legal liability without legislative aid).  Thus, lower courts have repeatedly declined to extend Bivens liability to alleged violations of a prisoner's First Amendment rights.  See, e.g., Tanvir v. Lynch, 128 F. Supp. 3d 756, 770 (S.D.N.Y. 2015); Saleh v. United States, No. 09-02563, 2011 WL 2682803, at *10-12 (D. Colo. March 8, 2011), overruled in part on other grounds, 2011 WL 2682728 (D. Colo. July 8, 2011).  Because the Supreme Court has declined to extend Bivens to encompass First Amendment claims in any context, the Court dismisses Count IV for failure to state a claim.

## II.    Motion For Summary Judgment

Defendants seek summary judgment on each of plaintiff's claims.  The Court has found that

defendants are entitled to dismissal of Counts III, IV and V. Therefore, the Court addresses defendants' motion for summary judgment on plaintiff's <u>Bivens</u> claims for (1) excessive force in violation of the Fourth and Fifth Amendments (Count I) and (2) failure to intervene and prevent excessive force in violation of the Fourth and Fifth Amendments (Count II).

      A.    <u>Legal Standards</u>

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Hill v. Allstate Ins. Co.</u>, 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Nahno-Lopez v. Houser</u>, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to dispositive matters for which he carries the burden of proof. <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). The nonmoving party may not rest on his pleadings but must instead set forth specific facts supported by competent evidence. <u>Nahno-Lopez</u>, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary

judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51.  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

B.      Summary Judgment Facts

The following facts are either undisputed or construed in the light most favorable to plaintiff.

On July 27, 2008, Mochama, a native and citizen of Kenya, entered the United States as a non-immigrant student with an F-1 visa.[15]  On July 27, 2009, a Notice to Appear initiated removal proceedings against him in the Kansas City Immigration Court.  In July of 2010, attorney Matthew Hoppock filed with DHS a Notice of Entry of Appearance as Attorney or Accredited Representative Form G-28.[16]

On April 6, 2011, an Immigration Judge granted Mochama 60 days voluntary departure

---

[15]      An alien may enter the United States on an F-1 visa for the purpose of pursuing a course of study at a college or university. 8 U.S.C. § 1101(a)(15)(F).

[16]      Immigration regulations require that all representatives file a Notice of Entry of Appearance before appearing on behalf of any alien before the Immigration Court, U.S. Customs and Immigration Services ("USCIS"), ICE or U.S. Customs and Border Patrol ("CBP").  See 8 C.F.R. § 1003.17(a) (requiring filing of Form EOIR-28 prior to entry of appearance before Immigration Court).  According to the Immigration Court Practice Manual, "[a]ll representatives must file a Notice of Entry of Appearance . . . (Form EOIR-28)."  See U.S. Dep't of Justice, EOIR, Office of the Chief Immigration Judge Practice Manual, Ch. 2.1 at 15.  The Practice Manual also states that "[t]he Immigration Court will not recognize a representative using a Form EOIR-27 or a Form G-28." Id. at 16.

pursuant to INA § 240B(b)(1), with an alternate Order of Removal to Kenya which would be effective if Mochama failed to depart by June 6, 2011.  Voluntary departure was contingent on posting a $500 bond.  On April 11, 2011, through his attorney, Mochama appealed the decision of the Immigration Judge to the Board of Immigration Appeals ("BIA").  On March 9, 2012, Hoppock filed a motion to withdraw as Mochama's counsel because of a conflict with another client.  On March 15, 2012, the BIA denied Hoppock's motion to withdraw because Hoppock had not mailed the request to Mochama and did not provide Mochama's last known address.

On March 19, 2013, the BIA dismissed Mochama's appeal.  It did not reinstate the order of voluntary departure because Mochama had not posted the $500 voluntary departure bond.  The BIA decision constituted a final order of removal as defined by 8 C.F.R. § 241.1.  On May 30, 2013, law enforcement officers arrested Mochama pursuant to a final order of removal.[17]  See 8 U.S.C. § 1231.

On June 13, 2013, and July 24, 2013, acting pro se, Mochama filed handwritten letters with the Immigration Court which sought to re-open his case due to ineffective/incompetent counsel.  On September 4, 2013, the Immigration Court treated the letters as motions to re-open and overruled them for lack of jurisdiction.  See Artman Decl., Ex. B, C, D.

On July 18, 2013, Mochama filed a petition for review with the First Circuit Court of Appeals, which transferred the petition to the Eighth Circuit Court of Appeals.  On November 13, 2013, the Eighth Circuit dismissed the petition for lack of jurisdiction as untimely filed.

On July 24, 2013, Mochama was personally served with Form I-229a, which is a warning for failure to depart.  Mochama provided a signature and fingerprint on the Form I-229a.  See Artman

---

[17]     The government has not charged Mochama with any crime for failure to cooperate with his removal.

Declaration, ¶ 11, Exhibit E.  A Form I-229a is a routine form generated to warn aliens of potential liability for non-compliance with removal and does not contain specific allegations of noncompliance.

On October 28, 2013, Mochama received a Notice of Continued Detention/Imminent Removal letter pursuant to 8 C.F.R. § 241.4(g)(4).  This notice stated that his removal flight was scheduled for November 5, 2013.  See Artman Declaration, Ex. F and G.  The notice was not served on Hoppock, the attorney who had filed a Notice of Entry of Appearance as Attorney Form G-28 with the DHS in 2010 and had not withdrawn his appearance.

Mochama's removal flight was rescheduled to January 28, 2014 due to transfer of custody to the United States Marshal's Service.[18]  See Artman Declaration, ¶ 13, Exhibit F, G and H; Nichols Declaration, ¶ 3, Exhibit A.

ICE policy provides that when ICE issues a final order of deportation or removal, it must also prepare a Warrant of Removal on Form I-205.  See Declaration of Jane Patty-Kill, Exhibit 6, ¶ 3. Form I-205 includes facts about where, when and how a deportee leaves the United States.  See 8 C.F.R. § 241.2 (ICE agents must complete Form I-205 in every case resulting in final order of removal to memorialize alien's departure from United States); see Artman Declaration, ¶ 15.  Agents must document the identity of the alien with a fingerprint on the Form I-205.  See Patty-Kill Declaration, Exhibit 6, ¶ 3.[19]

---

[18]     The record does not indicate why Mochama was transferred to the custody of the United States Marshal's Service.

[19]     Patty-Kill understood that at the time of an alien's physical removal, the officer executing the final order must obtain a classifiable rolled print of the alien's right index finger on the Form I-205.  She believes that a fingerprint on the Form I-205 is required to confirm the identity
(continued...)

On January 28, 2014, at about 4:00 AM, Nichols and Zwetow arrived at the Butler County Detention Facility to transport Mochama and another alien, Simon Wachira, to the Wichita airport for their flight to Kenya pursuant to final orders of removal.  Mochama testified that when Nichols and Zwetow arrived, no one told him of an actual plan of deportation.  He testified that he had only been told that he needed to sign and fingerprint a Form I-229a and that he could not have his attorney review it first.  Mochama Declaration, ¶¶ 7-8, 27.

When Nichols and Zwetow arrived at plaintiff's cell, he was standing on a bench looking out the window.  Nichols and Zwetow assert that when they arrived, both Mochama and Wachira appeared agitated.  Mochama testified that he was not agitated, however, until the agents began to physically harm him.  Id. ¶ 9.  Mochama points to a video taken on the morning of January 28, 2014, in which he stands calmly with his hands in his pockets until the agents physically attack him.  In the video, Wachira clearly appears to be yelling, waving his arms and exhibiting agitation. Defendants point out that the video does not show when Nichols and Zwetow first encountered Mochama in his cell because it was taken after the agents had moved Mochama and Wachira to the booking area.

Nichols and Zwetow state that they told Mochama and Wachira that agents would take them to the airport that morning and that they each needed to fingerprint and sign a Form I-205.  See Nichols Declaration, ¶ 6; Zwetow Declaration, ¶ 5.  Mochama's declaration states that the agents presented a Form I-229a, not a Form I-205.  He also states that no one told him about an actual plan to deport him, only that he needed to sign and fingerprint a form and that he could not have his

---

[19](...continued)
of the alien who is removed.  See Patty-Kill Declaration, ¶ 4.

attorney review it.  Mochama Declaration, ¶¶ 7, 8, 27.  The agents told Mochama and Wachira that they had exhausted their appeals and that a final order of removal had been entered.  <u>See</u> Nichols Declaration, ¶ 6; Zwetow Declaration, ¶ 5.  Mochama stated that he wanted to talk with an attorney.  <u>See</u> Nichols Declaration, ¶ 6; Zwetow Declaration, ¶ 5. Nichols asked him the name of his attorney and Mochama said that he did not have one but wanted to get one.[20]

Nichols and Zwetow again explained to Mochama that they needed him to fingerprint the form.  <u>See</u> Nichols Declaration, ¶ 6; Zwetow Declaration, ¶ 7.  As the agents reached for Mochama's hand, Mochama refused to take his hands from his pockets.  <u>See</u> Nichols Declaration, ¶ 7; Zwetow Declaration, ¶ 7.  Nichols and Zwetow pulled at Mochama's arms and lifted him into the air. Zwetow then punched Mochama in the stomach with his closed right fist as Nichols held him.  Next, Zwetow put his right arm around Mochama's neck and pulled backwards.  Mochama sank to the floor.  Zwetow placed his right knee up and used it as a fulcrum to slam Mochama head-first into the concrete floor while Nichols held Mochama's right hand, so that he was unable to brace himself or prevent his head from hitting the concrete floor.  Mochama placed his right hand under his stomach/torso (where he had just been punched) and put his left arm under his head to prevent it from being further hit into the concrete floor as Zwetow pushed down on his neck.  Zwetow pushed down on Mochama's head and back while Nichols tried to pull at Mochama's right arm, which was under his stomach.[21]

---

[20]   For security reasons, detainees are not permitted to make phone calls at the time of removal.  Zwetow Declaration, ¶ 5.

[21]   Defendants assert that the video of this encounter demonstrates that Mochama's characterization of the events is untrue.  The video, however, supports Mochama's version of the events to a significant degree.

Nichols and Zwetow testified that they repeatedly told Mochama to stop resisting and to cooperate with fingerprinting, but Mochama continued to physically resist their commands to remove his hands from underneath his chest.  Id.  Defendants present evidence that they were trying to get Mochama to fingerprint a Form I-205; Mochama points to his declaration that defendants were trying to get him to fingerprint a Form I-229a.  At one point, Zwetow got up to retrieve the form and the inkpad while Nichols remained on top of Mochama.  See Nichols Declaration, ¶ 8; Exhibit 4.  Mochama continued to resist the agents' commands to cooperate with fingerprinting.  Id.[22]

Nichols and Zwetow stopped their effort to retrieve Mochama's fingerprint and allowed him to stand.  Mochama had some blood on his sweatshirt and a scratch or cut on the back of his hand.  The nurse who treated him later in the day observed blood on the right side of his face.[23]

Mochama told Nichols and Zwetow that he was bleeding, that his head hurt and that he wanted to see a doctor.  They denied his request.  Mochama Declaration, ¶ 13.[24]  Zwetow called the ICE office in Wichita to tell them that he and Nichols would transport Mochama and Wachira to Wichita for processing.  Officers then shackled and handcuffed Mochama and Wachira without incident.  See Nichols Declaration, ¶ 9; Zwetow Declaration, ¶ 9.

At about 5:15 AM, Nichols and Zwetow arrived at the Wichita office with Mochama and

---

[22]    The video confirms that Mochama did not cooperate with the fingerprinting.

[23]    Mochama asserts that the video shows blood smeared on the booking room floor in the place where his right hand, ear and face had been.  From the video, it is not clear what was on the floor.  The video does show that at one point after Mochama was seated, Zwetow examined the floor where Mochama had been taken down.  The video also shows that an employee sprayed liquid on the floor in that spot, then took the spray nozzle off of the bottle, poured the liquid on the floor and wiped it up.

[24]    Both parties include citations and argument in their statements of fact. The Court disregards all legal argument set forth in the fact section.  See D. Kan. Rule 56.1.

Wachira.  ICE agent Alan Van Skike met them.  Nichols Declaration, ¶ 10; Zwetow Declaration, ¶ 10.  Nichols and Zwetow told Van Skike that Mochama had been non-compliant at the Butler County Detention Facility and that his earlobe was bleeding from having been taken down.  See Van Skike Declaration, Exhibit 5; ¶ 5.  Van Skike entered Mochama's cell to assess Mochama's demeanor and bleeding.  Van Skike was able to calm Mochama and remove his restraints.  Van Skike observed that Mochama's ear was not bleeding at the time but it appeared that a small sore had been opened behind his earlobe.  Id.

At approximately 6:10 AM, Patty-Kill and ICE agent Andrew Pleviak entered the detention area.  See Patty-Kill Declaration, ¶ 5; Pleviak Declaration, ¶ 3.  They took Mochama out of his cell, and Patty-Kill explained that they needed him to fingerprint the form.  See Patty-Kill Declaration, ¶ 6.  When Patty-Kill attempted to grasp his right hand to take his fingerprint, Mochama pulled his arm away and quickly moved away from her.  Zwetow grabbed Mochama from behind and Mochama immediately began aggressively resisting.  Zwetow put both arms around Mochama's midsection and picked him up into the air.  The agents testified that as Zwetow grabbed him, Mochama kicked his legs up toward Patty-Kill's face.  See Zwetow Declaration, ¶ 11; Nichols Declaration, ¶ 11.

The surveillance camera at the Wichita ICE office recorded the incident.  Van Skike Declaration, ¶ 6; Pleviak Declaration, ¶ 4; Patty-Kill Declaration, ¶ 7; Exhibit 8, ERO Videos 1 and 2.  The video does not show that Mochama attempted to kick anyone.  When Zwetow lifted Mochama into the air, Patty-Kill was about eight to ten feet away.  With Mochama in the air, Zwetow picked up his own right leg and kicked/kneed Mochama's legs from behind, causing them both to move forward.  See Exhibit 8; see also Mochama Declaration, ¶ 20.  Zwetow swung

Mochama to the right, causing Mochama's head to hit the wall.  Mochama Declaration, ¶ 21.  Aided by Nichols and Van Skike, Zwetow flipped Mochama and pushed him face-down to the floor.  Id.  At one point, Nichols was on top of Mochama, allowing Zwetow, Van Skike and Pleviak enough control of Mochama's arms so that Patty-Kill could obtain Mochama's fingerprint on the Form I-205.  See Nichols Declaration, ¶ 11; Zwetow Declaration, ¶ 11; Van Skike Declaration, ¶ 6; Pleviak Declaration, ¶ 4; Patty-Kill Declaration, ¶ 7; Exhibit 8, ERO Videos 1 and 2.

Zwetow then yanked at the back of Mochama's sweatshirt and Mochama stood up, crying. As Van Skike and Zwetow escorted him to the holding cell, Mochama grabbed the form and tore it into pieces.  See Nichols Declaration, ¶ 12; Zwetow Declaration, ¶ 11; Van Skike Declaration, ¶ 7; Pleviak Declaration, ¶ 5; Patty-Kill Declaration, ¶ 7; Patty-Kill Declaration, Exhibit B and Exhibit 8, ERO Videos 1 and 2.  The agents then shoved Mochama into a holding cell.

In the cell, Mochama was shaking and dizzy and vomited. See Mochama Declaration, ¶ 23. After a few minutes, he saw from the cell door window that officers were attacking Wachira. Mochama then began pounding on the window and door and shouting, pleading with them to stop hurting his friend.

At this point, Mochama was bleeding from his ear and face.  His head hurt and he was dizzy, so he asked to go to hospital.  Mochama Declaration, ¶ 24. Instead, later that same day, ICE agents Jonathan Joyce, Andrew Martin and Doug Thompson transported Mochama back to the Butler County Detention Center.[25]

---

[25]     Nichols and Zwetow testified that before he left to return to the Butler County Detention Center, Mochama never complained about any injuries and did not state that he had vomited.  See Nichols Declaration, ¶ 13; Zwetow Declaration, ¶¶ 12, 13.  After agents returned Mochama and Wachira to Butler County, officials refused to accept Wachira because he had been injured so badly.  They instead transported Wachira to the hospital for medical treatment.

Later that day, January 28, 2014, Jeannette Larimer, a registered nurse at the Butler County Detention Facility, examined Mochama. Defendants' Exhibit 9, ¶¶ 4, 5. She determined that he had a small scrape on his hand and left elbow and bleeding on the side of his face that appeared to be from an abscess or acne sore. He reported general soreness in his left hand and elbow. Id. She wrote that he had no trauma on his face, no swelling or visible bruising, no decreased range of motion in his extremities and no vision problems. Id. She noted that his pupils were equal and reactive to light, that he had a steady gait and equal grip strength and that his radial pulses were strong and present. Id. She prescribed 500 mg. of Tylenol twice daily for three days. Id. Larimer noted that at that time, Mochama had no other complaints. Id. Mochama asserts that despite his symptoms of concussion, Larimer did not examine him for a concussion. Mochama Declaration, ¶ 28.

On February 14, 2014, Zwetow attempted to serve Mochama with a Form I-229a, Warning for Failure to Depart. Mochama requested to speak with his attorney prior to signing it. Mochama refused to sign for receipt of the Form I-229a, so Zwetow documented his refusal to sign. See Zwetow Declaration, ¶ 14; Artman Declaration, ¶ 16, Exhibit I.[26]

Mochama remains in custody at the Butler County Detention Facility.

ICE use-of-force policy defines "hard techniques" to include the following:

> (1) Greater possibility of injury to participants;
> (2) Strikes with hand, arm, foot, leg, head or whole body;
> (3) Throws;
> (4) Take-downs;

---

[26]     Mochama states that pursuant to 8 C.F.R. § 292.5, whenever an immigrant is represented by counsel, service must be on his attorney. The individual defendants concede that Mochama's attorney entered his appearance with the DHS in 2010. They do not allege that counsel ever withdrew his appearance before the DHS. Zwetow did not serve the Form I-229a on Mochama's attorney.

(5) Impact weapons when used for striking; and
(6) Specialty impact weapons.

Exhibit F, p. 2-3.

C.    Analysis - Motion For Summary Judgment

Defendants assert that they are entitled to qualified immunity on plaintiff's Bivens claims for (1) excessive force in violation of the Fourth and Fifth Amendments (Count I) and (2) failure to intervene and prevent excessive force in violation of the Fourth and Fifth Amendments (Count II).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009). The Court asks whether, taken in the light most favorable to plaintiff, the facts demonstrate that defendant's conduct violated a constitutional right and whether the right was clearly established. Id. The Court has discretion to address the two prongs in any order. Becker v. Bateman, 709 F.3d 1019, 1022 (10th Cir. 2013). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment – showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." Clark v. Edmunds, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal citation omitted).

For a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. Panagoulakos v. Yazzie, 741 F.3d 1126, 1129 (10th Cir. 2013). The Tenth Circuit applies a sliding scale to determine when law is clearly established. Pauly v. White, 814 F.3d 1060, 1075 (10th Cir. 2016). Under this sliding scale, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case

law to clearly establish the violation." Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007) (internal quotation marks and citation omitted).

To show that the constitutional right was "clearly established" at the time defendant acted does "not require a case directly on point." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). On the other hand, courts may not define clearly established law "at a high level of generality;" existing precedent must have placed the statutory or constitutional question beyond debate. Id. at 741-742 (citations omitted). The right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).

1.    Count I – Excessive Force - All Defendants

Plaintiff alleges that during two incidents on January 28, 2014, defendants used excessive force in violation of the Fourth and Fifth Amendments. Defendants assert that they are entitled to qualified immunity on this claim.

Before analyzing defendants' claim of qualified immunity, the Court must examine the basis of plaintiff's excessive force claim. A plaintiff can assert an excessive force claim under the Fourth, Fifth, Eighth or Fourteenth Amendment, but "each carries with it a very different legal test." Estate of Booker v. Gomez, 745 F.3d 405, 419 (10th Cir. 2014) (quoting Porro v. Barnes, 624 F.3d 1322, 1325 (10th Cir. 2010)). Thus, a district court evaluating an excessive force claim must first identify the precise constitutional violation which plaintiff asserts; "[t]he choice of amendment matters." Porro, 624 F.3d at 1325 (citing Baker v. McCollan, 443 U.S. 137, 140 (1979)); see also Graham v. Connor, 490 U.S. 386, 393-95 (1989). As the Tenth Circuit has explained,

-34-

> Any force used leading up to and including an arrest may be actionable under the Fourth Amendment's prohibition against unreasonable seizures. By contrast, claims of excessive force involving convicted prisoners arise under the Eighth Amendment. And when neither the Fourth nor Eighth Amendment applies – when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment – we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action.

Gomez, 745 F.3d at 419.  The Fifth Amendment due-process standard controls excessive force claims brought by federal detainees, including immigration detainees.[27]  Porro, 624 F.3d at 1326.

Here, plaintiff has alleged claims of excessive force under the Fourth and Fifth Amendments. He asserts that he was detained pending deportation, and does not dispute that he was lawfully seized and detained.  Thus, his excessive force claims falls under only the Fifth Amendment due process clause.[28]  See id. at 1326; see also Edwards v. Johnson, 209 F.3d 772, 778 (5th Cir. 2000) (analyzing excessive force claim by immigration detainee under Fifth Amendment due process clause).

To establish a claim of excessive force under the Fifth Amendment, plaintiff must show that each defendant had "*direct personal responsibility* for the claimed deprivation of a constitutional right."  Porro, 624 F.3d at 1327 (quoting Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006)); see also Novitsky v. City of Aurora, 491 F.3d 1244, 1254 (10th Cir. 2007) (mere presence at scene insufficient; defendant must have "personally participated" in deprivation).

Plaintiff's excessive force claim rests on two separate incidents on January 28, 2016; the

---

[27]     The Fourteenth Amendment due process clause governs any claim of excessive force against a *state* official by a "pretrial detainee." Gomez, 745 F.3d at 419 (citing Bell v. Wolfish, 441 U.S. 520, 536 (1979)).  In this context, a "pretrial detainee" is one who has had a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest."  Id.

[28]     Further, plaintiff was not serving a sentence as punishment for a crime, in which case the Eighth Amendment protection against cruel and unusual punishment would control.  Porro, 624 F.3d at 1326.

Court analyzes each in turn.

        a.    <u>Incident At Butler County Detention Facility – Nichols And Zwetow</u>

Viewing the facts in the light most favorable to plaintiff, he was a pretrial detainee who initially was not acting aggressively. The Court therefore first determines whether use of force by Nichols and Zwetow violated his plaintiff's Fifth Amendment due process rights.

In <u>Kingsley v. Hendrickson</u>, 135 S.Ct. 2466, 2473 (2015), the Supreme Court held that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." <u>Id.</u> at 2473. Thus, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." <u>Id.</u> Courts should not apply this standard "mechanically," but must consider the facts and circumstances of each case "from the perspective of a reasonable officer on the scene." <u>Id.</u> In determining whether the force was objectively unreasonable, the Court may consider the following factors set out in <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989): (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of plaintiff's injury; (3) any efforts to temper or limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (5) whether plaintiff was actively resisting. <u>Kingsley</u>, 135 S.Ct. at 2473 (list of factors not exclusive).[29]

The Court must account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," <u>id.</u>, and defer when appropriate to "policies and practices that in the judgment of jail officials are needed to preserve internal order and

---

    [29]    <u>Kingsley</u> also reaffirms that pretrial detainees cannot be subjected to use of excessive force that amounts to punishment, because they "cannot be punished at all." 135 S.Ct. at 2475.

discipline and to maintain institutional security." Id. (quoting Bell v. Wolfish, 441 U.S. 520, 540 (1979) (internal quotations omitted)).  A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.  Id.

Applying the factors set out in Graham and Kingsley and considering the totality of the circumstances, the Court concludes that a reasonable jury could find that Nichols and Zwetow violated plaintiff's rights by using excessive fore in violation of the Fifth Amendment.  Viewed in the light most favorable to plaintiff, the evidence demonstrates that on the morning of January 28, 2014, plaintiff did not know that he was to be removed to Kenya that day.  Moreover, he had recently filed a habeas corpus petition challenging his continued detention.  When the officers initially asked him to fingerprint and sign the form, plaintiff asked to speak to an attorney.  The officers ignored that request, then removed plaintiff from his cell.  Zwetow told plaintiff that they needed to get his fingerprint.  In response, plaintiff put his hands in his pockets.  Within a few seconds, Nichols and Zwetow lifted plaintiff off his feet and Zwetow hit him very hard in the stomach/chest.  The officers then took plaintiff to the floor and hit his head on the floor.  As a result of the officers' actions, plaintiff sustained injuries.

Nichols and Zwetow note that on January 28, 2016, plaintiff was scheduled to be removed to Kenya pursuant to a final order of removal.  The government has a strong interest in orderly operation of detention facilities and the deportation process.  Defendants assert that they were carrying out a legitimate government order to remove plaintiff and that to do so they were required to obtain his fingerprints on a Form I-205.  See 8 C.F.R. § 241.2; ICE Policy 15.2(a).

Courts have found that use of some force against a detainee is reasonable where the detainee

has refused to comply with an order.  See Blount v. Echols, No. 07-5046, 2008 WL 4368936, at *8 (W.D. Ark. Sept. 24, 2008) (no excessive force where pretrial detainee pinned against wall for repeatedly refusing to comply with staff orders to move to back of cell).  The Court has found few cases that address use of force in fingerprinting a deportee.  District courts in other circuits have ruled that officers may use some force if a detainee resists a lawful order to provide fingerprints.  See Scott v. City of White Plains, No. 10-Civ.-1887(KBF), 2013 WL 1313774, at *7 (S.D.N.Y. Mar. 18, 2013) (ICE officers enttiled to qualified immunity on claims of excessive force and failure to intervene where officer briefly used pressure point to obtain fingerprint from uncooperative deportee); Wysner v. Dallas Cty. Sheriff's Dep't, No. 96-CV-1011, 1997 WL 10030, *3 (N.D. Tex. Jan 7, 1997) (officers may use some force to subdue pretrial detainee to obtain fingerprint); cf. New v. Perry, No. 07-cv-723, 2009 WL 483341, at *12 (S.D. Ohio Feb. 25, 2009) (jury question whether officers used unreasonable force when they slammed plaintiff to floor after he kept hands in pockets to avoid fingerprinting); see also 8 U.S.C. § 1357(a)(5) (ICE agents may use force to accomplish mission).     Here, applying the Graham factors, as reiterated in Kingsley, the Court finds a genuine issue of material fact as to the alleged violation.  Under plaintiff's version of the facts, the amount of force which Nichols and Zwetow used at the Butler County Detention Facility was objectively unreasonable.  Although the officers may have needed to use force, the amount of force which they  used was arguably excessive in light of the fact that very little time elapsed between when the officers asked plaintiff to produce his hand for a fingerprint and when Zwetow initiated use of force by hitting him in the chest/stomach.  Although defendants assert that plaintiff's injury was minimal, plaintiff has produced evidence that after the officers hit him and took him to the floor, he had a severe headache and sore fingers.  The officers made no attempt to temper the amount of force

first by using other means.  Further, the officers had other options, including placing plaintiff in restraints and writing a disciplinary report.  Moreover, at the time the officers asked plaintiff to fingerprint the form, plaintiff had not created a serious security problem, and any threat which the officers perceived was necessarily minimal.  Finally, plaintiff was not proactively resisting but merely had his hands in his pockets.  Looking at the totality of the interaction between plaintiff and the two officers at the Butler County Detention Center, a reasonable person could find that the amount and type of force which defendants applied to plaintiff was unreasonable.

Because plaintiff has produced evidence that Nichols and Zwetow violated a constitutional right, the Court must determine whether, based on plaintiff's version of the facts, it should have been apparent to the officers involved that their actions were objectively unreasonable in the situation they confronted.  Vondrak v. City of Las Cruces, 535 F.3d 1198, 1205 (10th Cir. 2008); Meredith v. Erath, 342 F.3d 1057, 1061 (9th Cir. 2003); see also Burden v. Carroll, 108 Fed. App'x 291, 293-94 (6th Cir. 2004).  Based on the state of the law on January 28, 2014, reasonable officers would have been aware that this level of force could not be justified solely on the basis of their need to get a fingerprint.  Thus, for purposes of summary judgment, defendants are not entitled to qualified immunity on plaintiff's Fifth Amendment excessive force claim.

b.      Incident At Wichita ICE Office – All Defendants

As for the incident at the ICE office in Wichita on January 28, 2014, the Court agrees that plaintiff cannot show a constitutional violation because, as a matter of law, the force the agents used was objectively reasonable.

The incident in Wichita began when Patty-Kill explained the Form I-205 and attempted to obtain plaintiff's fingerprint.  Plaintiff quickly pulled his arm away and moved away from the

processing desk.  When Zwetow and Patty-Kill attempted to gain control of  plaintiff, he became

combative.  Zwetow grabbed plaintiff from behind and plaintiff began kicking.  Officers took him

to the floor, where he continued to actively resist.  During this incident, the officers had reason to

be concerned about their safety and the orderly functioning of the detention center.

Because plaintiff cannot show a genuine issue of material fact whether officers violated his

constitutional right to be free from excessive force, each individual defendant is entitled to qualified

immunity as to the incident at the ICE office in Wichita.

B.     Count II – Failure To Intervene – Nichols, Van Skike, Patty-Kill and Pleviak

Plaintiff asserts that during the incident at the Butler County Detention Center,  Nichols did

not attempt to intervene to prevent Zwetow from harming him.  Plaintiff further contends that all

defendants participated in the second incident at the Wichita ICE office and that Nichols, Van Skike,

Patty-Kill and Pleviak deliberately refused to intervene after becoming aware that Zwetow was

physically harming him.

Law enforcement officials have an affirmative duty to intervene to protect the constitutional

rights of citizens from infringement by other law enforcement officers in their presence.  Vondrak

535 F.3d at 1210.  An officer who fails to intercede is liable for preventable harm caused by the

actions of other officers where the officer observes or has reason to know that (1) excessive force

is being used, (2) a citizen has been unjustifiably arrested or (3) a law enforcement official has

committed any constitutional violation.  Id.  In order for liability to attach, defendant must have had

a realistic opportunity to intervene to prevent the harm from occurring.  Id.  In the context of an

excessive force claim, if plaintiff did not suffer excessive force, there can be no claim for failure to

intervene.  See, e.g., Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008); Mick v. Brewer,

76 F. 3d 1127, 1136 (10th Cir. 1996).

Here, Nichols and Zwetow and were the only defendants present during the incident at the Butler County Detention Facility.  Plaintiff has created a genuine issue of material fact whether Zwetow and Nichols violated his Fifth Amendment rights.  Therefore Nichols is not entitled to summary judgment on plaintiff's claim that he failed to intervene during the incident at Butler County Detention Facility.

Plaintiff also claims that Nichols, Van Skike, Patty-Kill and Pleviak violated his rights when they failed to intervene in the incident at the ICE office in Wichita to prevent Zwetow from using excessive force.  The Court has found that Nichols and Zwetow are entitled to summary judgment on plaintiff's claim that they violated his Fifth Amendment rights during the incident in Wichita. Thus plaintiff cannot show that other officers had a duty to intervene. See Fogarty, 523 F.3d at 1162. Accordingly, Nichols, Van Skike, Patty-Kill and Pleviak are entitled to summary judgment on plaintiff's failure to intervene claim as to the incident at the ICE office in Wichita.

**IT IS THEREFORE ORDERED** that the Federal Defendants' Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment (Doc. #74) filed July 29, 2015 is be and hereby is **OVERRULED in part and SUSTAINED in part**.

**IT IS SPECIFICALLY ORDERED** that Alan Van Skike, Jane Patty-Kill and Andrew Pleviak are entitled to summary judgment on plaintiff's claims that they violated his Fourth and Fifth Amendment rights when they (a) used excessive force at the Wichita ICE Office (part of Count I) and (b) and failed to intervene at the Wichita ICE Office (part of Count II).

**IT IS FURTHER ORDERED** that defendants Rodney Nichols and Timothy Zwetow are entitled to summary judgment on plaintiff's claim that they violated his Fourth and Fifth Amendment

rights when they used excessive force at the Wichita ICE Office (part of Count I).

**IT IS FURTHER ORDERED** that defendants Rodney Nichols and Timothy Zwetow are not entitled to summary judgment on their contention that they are entitled to qualified immunity on plaintiff's claim that they violated his Fourth and Fifth Amendment rights when they used excessive force at the Butler County Detention Center (part of Count I).

**IT IS FURTHER ORDERED** that defendant Rodney Nichols is entitled to summary judgment on plaintiff's claims that he violated plaintiff's Fourth and Fifth Amendment rights when he failed to intervene at the Wichita Ice Office (part of Count II).

**IT IS FURTHER ORDERED** that defendant Rodney Nichols is not entitled to summary judgment on his contention that he is entitled to qualified immunity on plaintiff's claim that he violated plaintiff's Fourth and Fifth Amendment rights when he failed to intervene during the incident at Butler County Detention Center (part of Count II).

**IT IS FURTHER ORDERED** that plaintiff's claim that defendants Rodney Nichols and Timothy Zwetow caused jail officials to place him in solitary confinement in violation of his Fifth and Eighth Amendment rights (Count III) is dismissed for failure to state a claim.  The Court therefore dismisses Count III in its entirety.

**IT IS FURTHER ORDERED** that plaintiff's claim that defendants Rodney Nichols, Timothy Zwetow, Alan Van Skike, Jane Patty-Kill and Andrew Pleviak retaliated against him for exercising his First Amendment rights (Count IV) is dismissed for failure to state a claim.  The Court therefore dismisses Count IV in its entirety.

**IT IS FURTHER ORDERED** that under the INA, 8 U.S.C. § 1252(b)(9), this Court lacks subject matter jurisdiction over plaintiff's claim that defendants Rodney Nichols, Timothy Zwetow,

Alan Van Skike, Jane Patty-Kill and Andrew Pleviak violated his right to counsel under the Fifth Amendment (Count V).  The Court therefore dismisses Count V in its entirety.

**IT IS FURTHER ORDERED** that plaintiff's claims that (1) Timothy Zwetow and Rodney Nichols violated his Fourth and Fifth Amendment rights when they used excessive force at the Butler County Detention Center (part of Count I) and (2) that Rodney Nichols violated plaintiff's Fourth and Fifth Amendment rights when Nichols failed to intervene during the incident at Butler County Detention Center (part of Count II) remain for trial.

**IT IS FURTHER ORDERED** that the parties shall promptly contact the Chambers of Honorable Magistrate Judge Theresa J. James to reconvene a scheduling conference.  See Order (Doc. #80).

Dated this 3rd day of January, 2017 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge